STATE OF MAINE                                          SUPERIOR COURT
CUMBERLAND, ss.                                         CIVIL ACTION
                                                        Docket No. CV-08-547

ANDREW WOTTON,

        Plaintiff,

    v.                                                ORDER

PORTLAND VENTURES LLC,

        Defendant.


The above captioned case was tried to the court, sitting without a jury, on July 22,

23, and 30, 2009. Thereafter the parties submitted lengthy post trial briefs, the last of

which was submitted on August 28, 2009.

In his complaint Andrew Wotton asserts two claims of employment

discrimination. First, he alleges that he was discriminated against and eventually

terminated because of his sexual orientation. Second, he alleges that he was terminated

in retaliation for his complaints about discriminatory comments made by Adam Cyr,

the manager of the Scarborough Fairfield Inn.[1]


Background Facts

Andrew Wotton was hired at the Fairfield Inn as a front desk associate in July

2007 and began work as a 90-day probationary employee on July 17, 2007. He was

terminated on August 22, 2007. Wotton is gay. Although he testified that his work at

the Fairfield Inn was uneventful until August, when he believes that the manager,

Adam Cyr, learned of his sexual orientation, the court credits Cyr's testimony that Cyr

---

[1] Defendant Portland Ventures LLC is the owner of the Scarborough Fairfield Inn. Portland
Ventures has a franchise agreement with the Marriott Corp. that allows it to use the brand name
"Fairfield Inn."

believed that it was likely that Wotton was gay when Wotton was hired. Wotton did experience difficulties beginning at some point in early August but those difficulties were not based on any discovery by Cyr that Wotton was gay.

Credibility Issues

This case was replete with credibility issues on both sides. At the outset, the court did not find the testimony of Geraldine Tavers, Donna Smith, and Denise Lunt to be credible in most respects. In addition, Wotton's own testimony was marked by certain significant inconsistencies.

By way of example, Wotton's most emotional testimony concerned an incident - not raised in Wotton's direct testimony but only on cross – where Cyr put on a jacket that Wotton had borrowed from his boyfriend and worn to work. While wearing the jacket Cyr briefly imitated a routine performed by comedian Chris Farley – "Big Man in Little Jacket" – in which Farley ultimately rips the seams of the jacket. In this case, when Wotton asked Cyr to take the jacket off and give it back, Cyr did so. At trial Wotton contended that there was a rip in the shoulder and the jacket was damaged. However, a set of notes Wotton had written shortly after his termination states that Wotton had thought Cyr was going to rip the jacket: "However he did not. But it made me feel so bad . . . " (D. Ex. 5) (emphasis added).

While Cyr's behavior during the jacket incident was inconsiderate (particularly for a supervisor) and reinforced Wotton's dislike of Cyr, Wotton's highly emotional reaction (when his notes acknowledge that no actual damage was done) was excessive and calls into question the accuracy of his perceptions and recollection. As is apparent from the findings below, the court credits certain aspects of Wotton's testimony but does not credit other aspects of that testimony.

2

At the same time, the court does not entirely credit Adam Cyr's testimony when he denied ever making suggestive remarks to Wotton about female employees. The court did find the complaints about Wotton's work performance by Susan Fishel and Anna Gregory to be credible.

Discrimination Based on Sexual Orientation

Employment discrimination claims are initially subject to the three part burden-shifting analysis based on *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973). *See Doyle v. Department of Human Services*, 2003 ME 61 ¶¶ 14-15, 824 A.2d 48, 53-54. In jury trials, the complexities of that process are dispensed with and the jury is simply asked whether (1) the plaintiff was in a protected status, (2) the plaintiff experienced adverse action, and (3) the plaintiff's protected status was the cause or a motivating factor for the adverse action. *See*, D. Alexander, *Maine Jury Instruction Manual* § 7-40 (4th ed. Release 12, 2009). The court will use that formulation here and finds that Wotton was in a protected status by reason of his sexual orientation and that he suffered adverse action but that he has not shown by a preponderance of the evidence that his sexual orientation was a cause of or a motivating factor for his termination.[2]

The major evidence offered by Wotton that he was discriminated against on the basis of his sexual orientation was his allegation that Cyr had referred to him as

---

[2] Alternatively, if the *McDonnell-Douglas* analysis applies, Wotton met his burden of producing evidence that he was in a protected status by reason of his sexual orientation and that he was subjected to termination at a time when other employees in his job classification who were not gay were retained. The Fairfield Inn then met its burden of producing evidence that it had a legitimate non-discriminatory reason to terminate Wotton. Wotton then bore the burden of proving that Fairfield Inn's stated reasons were a pretext and that he was in fact discharged because of his sexual orientation. Wotton failed to meet this burden. In addition, to the extent that the *McDonnell Douglas* burden-shifting analysis is superseded in "mixed motive" cases, Wotton failed as noted above to prove that his orientation was a motivating factor for his termination.

3

"Tinkerbelle" on two occasions. His testimony as to the number of instances was impeached by his deposition, where he had testified that it had only happened on one occasion. Cyr denied using that word. Whether he did or not, Wotton's deposition testimony established that the comment was allegedly made when Wotton and another employee were calling each other by their nicknames and that Wotton had recently had streaks put in his hair and virtually acknowledged that he resembled the Disney character. If said, the "Tinkerbelle" remark was a stray comment that in context did not demonstrate discriminatory intent.

Retaliation Claim

Wotton's retaliation claim has more evidentiary support. By mid-August, in part because of the Chris Farley jacket incident, which may have taken place as early as August 10 (*see* D. Ex. 5) but may also, according to Wotton's testimony, have triggered an email he wrote on August 20, Wotton disliked Cyr and had expressed his opinion of Cyr's managerial failings to other employees. For his part, Cyr had reason to have reservations about Wotton's work performance.

Sometime during the week beginning August 13, Wotton emerged from the office and told several employees who were taking a break at a picnic table on the Fairfield Inn property that he had just had a conversation with Cyr in which Cyr had stated that he was interviewing an attractive female applicant and intended to hire her in order to sleep with her. Wotton appeared to be upset and made a further comment that he was considering reporting Cyr to the Better Business Bureau.[3]

_____

[3] This latter complaint may have referred to Wotton's dissatisfaction that some of his paychecks had been held up in processing.

Cyr denies making this statement. Although the court cannot determine the facts with any degree of certainty, it finds that it is more likely than not that Cyr made some kind of suggestive comment with respect to a female applicant in Wotton's presence – although Wotton may have exaggerated what Cyr had said when he reported the statement at the picnic table.

One of the persons who heard Wotton's statement at the picnic table was Tammy Phillips. Phillips, although not a member of management, was the supervisor of the Inn's housekeepers. She did not have any supervisory authority over Wotton. However, Phillips reported the comment to Cyr and thereafter provided him with a written statement on August 20. Cyr met with Wotton with another supervisor present and asked Wotton if he had made the reported statement. Wotton denied making the statement.[4]

Around the same time Cyr and Susan Fishel, concerned that customer satisfaction scores at the Fairfield Inn were dropping and that the performance of the front desk staff needed improvement, held a meeting with all of the front desk associates including Wotton on August 17. At that meeting Fishel apparently took the lead, and she and Cyr emphasized that improvement was necessary on such issues as punctuality and customer service. One of the items emphasized at that meeting was the need for front desk associates, particularly those on the 3 p.m. to 11 p.m. shift, to make a "cash drop" at the end of their shift.[5]

Wotton had sent an email to Marriott as far back as August 5 asking what an employee should do if he is having trouble with his manager. That email, sent under

_____

[4] Wotton testified at trial that Cyr had said at the meeting he had gotten in trouble before for a similar issue but the court does not find that testimony to be credible. The alleged statement was not contained in Wotton's notes and was not mentioned at his deposition.
[5] A cash drop involved accounting for and depositing all cash received during previous shifts in a safe maintained near the front desk.

5

the name "Sebastian Wotton" did not refer to employment discrimination or violations of law, nor did it identify the hotel property involved. Moreover, since it was sent to Marriott (which allows Portland Ventures LLC to use the brand name Fairfield Inn under a franchise agreement), that email did not go to Wotton's employer.

On August 20 Wotton sent another email – again to Marriott. This email also did not mention employment discrimination or identify the hotel property involved, but Wotton stated in the email that he needed to remain confidential because his boss was already mad at him and was looking for a reason to fire him. The email also referred to unspecified wrong things the manager was doing. A Marriott employee responded that she needed identification of the hotel in order to assist Wotton.

All of these events came to a head on August 21-22. Sometime during the early evening of August 21 Wotton's email contact at Marriott ascertained that the Scarborough Fairfield Inn was managed by Hospitality Ventures of Atlanta (apparently a parent company of Portland Ventures LLC) and forwarded Wotton's August 20 email to Hospitality Ventures. Around the same time Susan Fishel, who was the most senior front desk associate, reported to Cyr on August 22 that Wotton was not improving. Fishel had been present on occasions when Wotton was late in reporting to the front desk, had heard Wotton complain that Cyr was a bad manager, and had received complaints from guests that Wotton had been rude. In particular, Fishel reported that Wotton had not made a cash drop at the end of his 3 to 11 shift on August 21.[6]

---

[6] There was a considerable dispute at trial as to whether Wotton had in fact missed the evening cash drop on August 21. Although Fishel's testimony initially suggested that Wotton may have missed an earlier cash drop under circumstances where there was a legitimate issue as to whether he was responsible for the cash drop, she eventually recalled that he had missed the August 21 evening drop. This is consistent with the time frame set forth in P. Ex. 6 ("did not complete drop 4 days after meeting which stressed the importance of the drop") and is consistent with Wotton's admission in his deposition that he missed the evening drop.

6

Cyr was in contact with his superiors in Atlanta on August 22[7] and the court finds it is more likely than not that he learned at that time that the Atlanta office had received from Marriott Wotton's August 20 email making unspecified complaints against his manager. Wotton was called in on August 22 and terminated.

The stated reasons for Wotton's termination are set forth in P. Ex. 6. Listed first on that document was "talking negatively about management," which included Wotton's statement at the picnic table and Wotton's August 20 email but also included other comments – not relating to any claims of employment discrimination or Cyr's allegedly salacious comment about a female applicant – which related to Cyr's alleged incompetence and lack of expertise and which had been repeated to Cyr. The second reason was the evening cash drop Wotton had missed on August 21 – four days after the August 17 meeting which has specified the importance of the drop. Also listed were statements that Wotton had called employees after hours to discuss management,[8] that Wotton talked inappropriately with other staff members causing an uneasy work environment, and that Wotton had been leaving his shift early. This last issue was substantiated by the evidence at trial. Plaintiff's Ex. 6 noted that Wotton was a 90-day probationary employee meaning that he did not have the procedural protections due to regular employees.[9]

---

[7] Apparently he had previously forwarded the written statement by Tammy Phillips to them.

[8] This refers to alleged after hours calls made by Wotton to another front desk associate named Amy Sanphy. In her testimony at trial, Samphy did not confirm that such calls had been made. Nevertheless, it was Cyr's belief on August 22 that Wotton had made such calls.

[9] The court did not find that the evidence offered by Wotton established that probationary employees were entitled to progressive discipline and credits the testimony of Anna Gregory that it was understood that the 90-day probationary period was a trial period after which, if employees are not performing in a satisfactory matter, "they let you go."

Left unstated in Plaintiff's Ex. 6 but also motivating Wotton's termination was the perception that Wotton's work in other areas was unsatisfactory, based on what Cyr and particularly Susan Fishel had observed.

Legal Analysis and Findings on Retaliation Claim

There are a number of legal issues relating to Wotton's retaliation claim that the court ultimately does not have to resolve. Specifically, those include the following:

> (1) Whether Wotton's statement at the picnic table to Tammy Phillips and other employees that Cyr had stated he was going to hire a female applicant in order to have sex with her constituted a report to Wotton's employer for purposes of 26 M.R.S. § 833(1)(A).

In the court's view, this does not matter because whether or not Tammy Phillips would qualify as Wotton's employer, which is doubtful, Phillips reported what Wotton said to Cyr. While the picnic table statement probably would not support a claim under the Whistleblowers Act, it certainly constituted "opposition" to Cyr's reported behavior and would support a retaliation claim under 5 M.R.S. § 4633 if Cyr's reported behavior constituted a practice unlawful under the MHRA.

> (2) Whether a statement by Cyr to the effect that he was going to hire an otherwise female applicant in order to have sex with her constituted an unlawful practice under the Maine Human Rights Act.

See 5 M.R.S. § 4633(1). The court has absolutely no doubt that if Cyr had actually hired an employee in order to have sex with her, it would constitute a violation of the MHRA. There was no evidence that he did so, or even that the female applicant in question was ever hired. Whether a manager's crude and offensive remark about a female applicant to a coworker (not the applicant) – unaccompanied by any action to implement the statement of intent – constitutes an unlawful practice is an open question.

8

The court is inclined to the view that Wotton's statement, based on his good faith understanding of what Cyr had suggested or implied, [10] constituted opposition to an unlawful practice for purposes of the anti-retaliation provision of the Maine Human Rights Act. If the only issue in this case was whether an employer could take adverse action against an employee for expressing his opposition to an employer's comment that he intended to hire an applicant for sexual purposes, the court would have very little hesitation in finding a violation of MHRA.

(3) Whether a "mixed-motive" claim of retaliation constitutes a viable claim under Maine law, 5 M.R.S. § 4633.

Federal law recognizes "mixed-motive" retaliation claims in the context of employment discrimination. In such cases, a plaintiff pursing a retaliation claim is not required to prove that he would not have been discharged "but for" the employer's retaliation for his opposition to an unlawful employment practice but need only prove that retaliation was a "motivating factor" for his discharge. *See, e.g.,* Pattern Jury Instructions for the District of Maine in Retaliation cases (Hornby, J.); *Tanca v. Nordberg,* 98 F.3d 680, 681 (1st Cir. 1996) (mixed-motive analysis discussed in U.S. Supreme Court's decision in *Price Waterhouse v. Hopkins,* 490 U.S. 228, applies in retaliation cases).

Plaintiff argues that a similar "mixed motive" concept should be applied to a retaliation claim under 5 M.R.S. § 4633(1). Defendant responds that Maine law does not recognize mixed motive discrimination claims, citing, *inter alia, Forrest v. Stinson Seafood Co.,* 990 F.Supp. 41, 44 (D. Me. 1998). Law Court precedent on this issue is ambiguous. *Compare Doyle v. DHS,* 2003 ME 61 ¶ 14, 824 A.2d at 54, *with id.* ¶ 16. However, the

---

[10] The court adheres to its earlier finding that it is likely that Cyr made some kind of suggestive comment with the implication that Wotton reported even if he did not use the words reported by Wotton.

9

court concludes that plaintiff has the better of this argument. *See, e.g.,* D. Alexander Maine Jury Instruction Manual § 7-40.

Applying this concept, the court finds that Wotton's picnic table statement was a motivating factor, and a significant motivating factor, for his termination. To be sure, Wotton's negative comments about management were not confined to his statement at the picnic table, and included other comments questioning Cyr's competence and inexperience. However, the picnic table statement was a significant issue to Cyr because he asked for a written statement about it from Phillips and called Wotton in to discuss it.

However, this does not end the inquiry. Where an employee proves that an adverse action was based in part upon an impermissible retaliatory motive, the employer may still escape liability if it proves that it would have made the same decision even in the absence of an unlawful motive. *See Tanca,* 98 F.3d at 681, 684 (in a mixed motive retaliation case employer may assert an affirmative defense that it would have taken the same action regardless).[11]

The court concludes that in this case the defendant proved by a preponderance of the evidence that although Wotton's picnic table statement was a motivating factor in his termination, he would have been terminated regardless of that statement and regardless of Wotton's August 20 email. On this issue the court relies on the evidence

---

[11] If Maine law follows Federal law in recognizing mixed motive discrimination under *Price Waterhouse,* then it follows that Maine law also incorporates the affirmative defense recognized in *Price Waterhouse.* In their post trial memoranda the parties do not disagree. Although Congress limited the *Price Waterhouse* affirmative defense to some extent in 42 U.S.C. §§ 2000e-2(m) and 2000e-5(g)(2)(B), the First Circuit in *Tanca* determined that those provisions do not apply in retaliation cases. 98 F.3d at 682-84. Moreover, the Maine Legislature has never passed legislation comparable to §§ 2000e-2(m) and 2000e-5(g)(2)(B), that would limit the affirmative defense recognized in *Price Waterhouse.* The Law Court, albeit in a different context, has cited *Price Waterhouse* with approval. *Bachelder v. Realty Resource Hospitality LLC,* 2007 ME 17 ¶ 21, 914 A.2d 1116, 1124.

10

referred to above and particularly on the testimony of Fishel and Gregory concerning the various deficiencies in Wotton's work performance.[12] Wotton was not entitled to progressive discipline as a probationary employee but the evidence establishes that he was aware of the dissatisfaction with his performance. Indeed, Wotton acknowledged during his testimony that he had continuously received criticism during his employment for numerous perceived failings in his work.

The entry shall be:

Judgment shall be entered in favor of defendant. No costs. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

DATED:     October _7_, 2009.

_____
Thomas D. Warren
Justice, Superior Court

---

[12] In the alternative, if defendant is correct that Maine would not recognize mixed motive retaliation, the court finds that Wotton has ultimately failed to prove that he would not have been terminated but for his picnic table statement and his August 20 email.

11

ANDREW WOTTON VS PORTLAND VENTURES LLC
UTN:AOCSsr  -2008-0105454                    CASE #:PORSC-CV-2008-00547
--------------------------------------------------------------------------
SEL VD                                REPRESENTATION TYPE      DATE
01 0000008996 ATTORNEY:BROWN, ELLA L
ADDR:ONE MONUMENT SQUARE PORTLAND ME 04101
     F FOR:PORTLAND VENTURES LLC             DEF       RTND   10/07/2008


02 0000009294 ATTORNEY:LORANGER, GUY D
ADDR:110 MAIN ST., SUITE 1520 SACO ME 04072
     F FOR:ANDREW WOTTON                      PL        RTND   09/18/2008




            Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:

Select the EXIT KEY for page selection line.